UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
STEELITE INTERNATIONAL U.S.A., INC. and
DWH&S, INC. f/k/a D.W. HABER & SON, INC.,

                              Plaintiffs,

                -against-                                          21-cv-2645 (LAK)


ROBERT KENNETH McMANUS,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


              Appearances:

                                        John G. Ebken
                                        Mark A. Beckman
                                        GORDON & REES LLP
                                        *Attorneys for Plaintiffs*


                                        Steven T. Halperin
                                        Jeffrey Weiskopf
                                        HALPERIN & HALPERIN, P.C.
                                        *Attorneys for Defendant*



LEWIS A. KAPLAN, *District Judge.*

              At root, this is a dispute about whether defendant – who long has gone by the name

Kenny Mack – may compete with an eponymous line of products sold by the plaintiffs.  But despite

the parties' attempts to characterize this dispute as involving either a post-employment non-compete

or a similar restriction imposed in connection with the sale of a business, the circumstances of this

case do not lend themselves precisely to either model.  The matter is before the Court on plaintiffs'

2

motion for a preliminary injunction.

<em>Facts</em>

In 2010, Robert Kenneth McManus, long known personally and professionally as Kenny Mack, started a business called Décor Home Accessories, LLC d/b/a Kenny Mack Designs ("Décor"). Décor designed, produced and sold resin tableware to hotels and restaurants. In 2016, however, Mack entered into two related transactions with DWH&S, Inc., f/k/a/ Haber & Son, Inc. ("Haber"). The deal involved an asset purchase agreement whereby Décor sold assets to Haber and an employment agreement between Haber and Mack.

*The 2016 Agreements*

*The Haber-Décor Asset Purchase Agreement*

The Haber-Décor Asset Purchase Agreement (the "2016 APA"),[1] in relevant part and with irrelevant exceptions, conveyed to Haber "all of Seller's right, title and interest in and to all of Seller's assets, whether tangible and intangible, used in connection with the operation of the Business and listed in Schedule 1." Schedule 1 included the "Seller's goodwill" and "[a]ll Seller's Intellectual Property, including Seller's websites, as listed in Schedule 9.16(d)." Schedule 9.16(d) listed only the following "trade name[s] or unregistered trademark[s] or service mark[s]":



---

[1]    2016 APA [Dkt. 32-4], § 1.

# kenny mack

Thus, the 2016 APA conveyed to Haber only whatever trademark or trade name rights Décor had enjoyed with respect to these two marks.

*The Employment Agreement*

At the same time, Haber and Mack entered into an employment agreement whereby Mack became an employee of Haber (the "Employment Agreement").[2] Broadly speaking, it made Mack the "Brand Manager/Product Development" at Haber for an initial term of two years and, unless earlier terminated, three one-year renewal terms.[3] Mack was to receive a base salary as well as possible annual increases tied to the levels of Kenny Mack product sales that Haber achieved in each relevant year.[4] In addition, Mack was entitled to possible additional payments, termed Earn Outs and Sales Bonuses, contingent upon Haber's Kenny Mack product revenues.[5] The contract contained also somewhat elaborate provisions for termination either with or without clause and for the extent to which Mack would be entitled to severance or other payments in either event.[6] While

---

[2]  Dkt. 30-2.

[3]  *Id.* §§ 1(a), 1(b).

[4]  *Id.* §§ 2(a), 2(b).

[5]  *Id.* § 2(c).

[6]  *Id.* § 3.

the details are unimportant, it suffices to say that Mack stood to fare considerably better from an

economic point of view if termination were without cause than if it occurred for cause.

The 2016 Employment Agreement contained also a 12-month restrictive covenant,

which in relevant part provided:

> "(b) Employee agrees that during the Employment Period and, upon
> either his resignation or termination for cause in accordance with
> Section 3, for twelve (12) months thereafter, (the 'Restricted Period'),
> he shall not without the Company's express written consent . . .
> directly or indirectly, engage in any Competing Business.  For
> purposes of this Agreement, 'Competing Business' means the design,
> manufacture or distribution of hotel and banquet service ware and
> equipment.
>
> "(c) During the Restricted Period, Employee shall not . . . induce or
> attempt to induce any . . . customer . . . of the Company to leave or
> cease doing business with the Company or in any way interfere with
> the relationship between any such . . . customer . . . and the
> Company."[7]

The effect of this restrictive covenant was to enhance, albeit only for twelve months,

the extent to which Haber would be protected against competition by Mack in the event of his

resignation or termination for cause.  By virtue of the 2016 APA, Haber's sole protection would have

been a possible action for trademark or trade name infringement, success in which would have

required proof, among other things, of likelihood of confusion.  Success on an action for breach of

the restrictive covenant would not have required such proof.

---

[7] *Id.* § 5.

*The 2019 Agreements*

In or about May 2019, Haber and Steelite negotiated a sale of Haber's assets – including its rights to the Kenny Mack trade name and trademarks – to Steelite.  At some point while this agreement was being negotiated, Mack was told that he would be terminated from his position at Haber.[8]  The parties dispute how this came about.  According to plaintiffs, Mack attempted to sell a competing line of products on LinkedIn and tried to purchase these products from Haber's manufacturers in violation of his Employment Agreement.[9]  Haber's former chief executive officer ("CEO") testified that he wanted to be "fair" to Mack and offered to negotiate a separation agreement that would provide Mack with severance payments – which would have been unavailable if Mack had been terminated for cause.[10]

Mack, on the other hand, denies that Haber had grounds to terminate him for cause.[11] According to Mack, he initially was told that he would be terminated because there would be no position for him at Steelite following the acquisition.[12]  Haber acknowledged also that Mack would not have been employed by Steelite regardless of whether there was cause for his termination.[13] Mack testified that he subsequently was threatened and given an ultimatum: he could  enter into a

---

[8]

Haber Dep. [Dkt. 30-3] at 41:19-23.

[9]

Pl. Br. [Dkt. 32] at 6.

[10]

Haber Dep. at 49:18-50:10.

[11]

Def. Supp. Br. [Dkt. 35] at 2.

[12]

Tr. at 37:23-38:4 (April 13, 2021).

[13]

Haber Dep. at 53:23-54:5.

separation agreement or he would be terminated for cause.[14]

Mack ultimately agreed to sign a separation agreement in June 2019 (the "Separation Agreement").[15] That agreement provided Mack with approximately $56,177 in severance pay and the outstanding Earn Out payments due under his Employment Agreement.[16] Section 5 of the Separation Agreement confirmed both Haber's and Steelite's right to take "exclusive possession of the intellectual property conveyed by" Mack in the 2016 APA and that Mack would not interfere with Haber's right to enforce or effectuate their exclusive possession of that property.[17]

In the second clause of Section 5, Mack agreed also to the following:

> "(ii) You acknowledge and agree that You shall hereafter cease and desist from: (a) directly or indirectly using any photo of Haber products on any Kenny Mack website; (b) directly or indirectly selling any product designs in Haber's or Steelite's current catalogue; and (c) soliciting any manufacturer of Haber products to supply You with products with designs substantially similar to those in Haber's or Steelite's current catalogue (including, for the avoidance of doubt, in the case of clauses (a), (b) and (c), any products the right to which were conveyed to Haber under the Asset Purchase Agreement). *You may continue to identify Yourself, personally and professionally, under the name 'Kenny Mack' but You may not use the name 'Kenny Mack' in commerce in connection with any business that competes with Haber or Steelite, or otherwise design goods for display in the food service industry.*"[18]

These covenants extended plaintiffs' protection against competition from Mack far

---

[14] Tr. at 38:12-21.

[15] Dkt. 32-6.

[16] *Id.* § 2.

[17] *Id.* § 5(i).

[18] *Id.* § 5(ii) (emphasis added).

beyond what was provided in the 2016 APA or that would have existed under the Employment Agreement if Mack had resigned or been terminated for cause.[19]  First, while the 2016 APA conveyed the Kenny Mack trademarks and trade name, the Separation Agreement purported to provide an exclusive right to use Mack's name "in commerce" to the extent of any competing business.  Second, it extended far beyond the 12-month non-compete provision in Mack's Employment Agreement by limiting Mack's ability to compete with plaintiffs in perpetuity.  Third, it arguably prohibited Mack from using "Kenny Mack" in "design[ing] goods for display in the food service industry" regardless of whether the use was or in competition with plaintiffs.

After signing the Separation Agreement, Steelite and Mack entered into a letter agreement (the "2019 Letter Agreement"), effective on or about the same date as the Separation Agreement, which reiterated that Mack "may continue to identify yourself, personally and professionally, under the name 'Kenny Mack' but you may not use the name 'Kenny Mack' in commerce in connection with any business that competes with Buyer or Seller *or otherwise design goods for display in the food service industry*."[20]

*Kenny Mack and Resorts World*

A little over a year after Mack's termination, Steelite learnt that Mack had reached out

---

[19]

The Separation Agreement was entered into between Mack and Haber only.  While Steelite was not a party to that agreement, it claims that it may enforce the rights conveyed therein as a third party beneficiary and because the 2019 APA granted Steelite the right to enforce any cause of action regarding Haber's intellectual property.  Compl. ¶¶ 37-39.  Defendants do not dispute that this is the case.  The Court assumes – for now – that Steelite may enforce the Separation Agreement.  Accordingly, and for the sake of simplicity, the Court refers to the rights conveyed in the Separation Agreement as "plaintiffs' rights."

[20]

Dkt. 32-8 (emphasis added).

8

to Resorts World Las Vegas ("Resorts World") and offered to sell it resin tableware products.[21]

Mack acknowledged that he had such discussions with the director of catering and banquets for

Resorts World, Ms. Urmeneta.  In particular, he testified, without contradiction, to the following

exchange:

> **BY MR. MCMANUS:**
>
> A: I then contacted one of the people [at Resorts World]. I introduced myself as Kenny Mack, formerly of Kenny Mack Designs and the Kenny Mack brand, which was now owned and operated by Steelite.
>
> Q: Who was the person that you introduced yourself to?
>
> A: Her name is Genevieve Urmeneta, Director of Catering and Banquets.
>
> Q: At Resorts World Las Vegas?
>
> A: Yes.
>
> \*    \*    \*
>
> Q: How did you describe to her the reason for your call?
>
> A. I called and described to her that my name was Kenny Mack, and before I could explain anything further, she said I know you, how are you? I said you know me? She said yes, I've used your products for years in hotel properties. I said well, they're no longer my products. They've been purchased and are now owned and marketed under the Steelite brand.[22]
>
> Following the call, Mack sent Ms. Urmeneta photos of products he had designed for

---

21

      Pl. Br. at 11.

22

      McManus Dep. [Dkt. 30-5] at 57:17-25; 58:21-59:5.

the Kenny Mack brand and explained that these were "a few cool former pieces to wet the whistle."[23] Each photo was labeled "FORMER KMD DESIGN for reference only."[24]

Steelite too had spoken with Resorts World about selling tableware products for the Las Vegas resort – although Steelite had not previously sold products for this location.[25]  According to Steelite's CEO, Resorts World ordered a large number of samples from Steelite, visited Steelite's showroom, and worked on a specifications list.[26]  Ultimately, however, Resorts World decided not to purchase products from Steelite and instead ordered tableware from Mack.[27]  Plaintiffs contend that Mack's conduct violated the covenants in the Separation Agreement and 2019 Letter Agreement and cost plaintiffs this business with Resorts World.

*Proceedings to Date*

*The Complaint*

Plaintiffs brought this action on March 26, 2021.  Their complaint alleges that Mack breached the covenants in Section 5(ii) of the Separation Agreement by using Steelite's photos to

---

[23]

Dkt. 32-9.

At the April 13, 2021 hearing, Mack testified that he had taken all but one of the photos in that email himself.  Tr. at 37:9-14.   Steelite's CEO claims that this particular photo is displayed in the image library of Steelite's website.  *Id.* at 28:1-12.

[24]

Dkt. 32-9.

[25]

Tr. at 10:19-11:1.

[26]

*Id.* at 12:22-25.

[27]

*Id.* at 9:19-21; 10:4-13.

market products to Resorts World, selling product designs that appeared in Steelite's catalogue to Resorts World, and using the name Kenny Mack in commerce to compete with Steelite.[28]  Plaintiffs allege also that Mack's actions breached the 2019 Letter Agreement.[29]  Finally, they allege that Mack's use of the name "Kenny Mack" when communicating with Resorts World constitutes trademark infringement in violation of Section 43 of the Lanham Act.[30]   The complaint includes claims of unjust enrichment and false advertising as well.[31]

### The Motion for a Temporary Restraining Order

On April 1, 2021, plaintiffs sought an order to show cause with a temporary restraining order ("TRO") barring Mack from competing with Steelite as alleged in the complaint.[32] Following argument on April 5, 2021, the Court denied the TRO and scheduled an evidentiary hearing on plaintiffs' application for a preliminary injunction.[33]

### The Preliminary Injunction Hearing

In advance of the preliminary injunction hearing, the parties engaged in limited

---

[28]    Complaint [Dkt. 1] ¶ 57.

[29]    *Id.* at ¶ 72.

[30]    15 U.S.C. § 1125(a)(1); Cpt at ¶¶ 86-89.

[31]    *Id.* at ¶¶ 79-83, 95.

[32]    Dkt. 9.

[33]    Dkt. 22.

discovery, including the depositions of Mack, Haber's CEO, David Haber, and Steelite's CEO, John Miles.  Mack and Miles testified at the hearing.  The Court then invited counsel to submit supplemental briefing addressing the standard for enforcement of restrictive covenants in contracts outside of the sale of a business or the employment context.[34]  Those briefs have now been submitted and the matter is ripe for decision.[35]

## Discussion

### The Preliminary Injunction Standard

"District courts may ordinarily grant preliminary injunctions when the party seeking the injunction demonstrates (1) that he or she will suffer irreparable harm absent injunctive relief, and (2) either (a) that he or she is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party."[36]  "Finally, the court must ensure that the

---

[34] Tr. at 54:16-25, 55:9-13.

[35] Neither parties' supplemental briefs addressed the question posed by the Court at the preliminary injunction hearing.  Instead, each raised new arguments that were not included in their initial briefs.  But those belated arguments "come too late for [the Court's] consideration."  *Bruh v. Bessemer Venture Partners III L.P.*, 464 F.3d 202, 209 (2d Cir. 2006).

[36] *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005) (Sotomayor, J.) (citations and quotation marks omitted).  This standard remains in effect. *See Citigroup Global Markets, Inc. v. VCG Special Opps. Master Fund Ltd.*, 598 F.3d 30, 34-38 (2d Cir. 2010) ("The 'serious questions' standard permits a district court to grant a preliminary injunction . . . where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction."). *See also Spanski Enterprises, Inc. v. Telewizja Polska S.A.*, 832 F. App'x 723, 724 (2d Cir. 2020) (same).

public interest would not be disserved by the issuance of a preliminary injunction."[37]

*Assessment of the Merits*

    *The Breach of Contract Claim*

        Restrictive covenants may be enforceable in three types of contacts: (a) contracts for the sale of a business, (b) employment contracts, and (c) ordinary commercial contracts.[38] Those that are incidental to the sale of a business usually are enforced "because the buyer has in part bargained for the good will of the seller's customers."[39] On the other hand, restrictive covenants in employment contacts are "strictly construed because of the powerful considerations of public policy which militate against sanctioning the loss of a persons livelihood."[40] Finally, restrictive covenants in ordinary commercial contracts are analyzed "under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract."[41]

        Plaintiffs argue that the Separation Agreement and 2019 Letter Agreement were incidental to the 2016 sale of Mack's business to Haber.[42] Accordingly, they submit that the

---

[37]
    *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (internal quotation marks omitted).

[38]
    *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 610 (S.D.N.Y. 2001). *See also Crye Precision LLC v. Bennettsville Printing*, 755 F. App'x 34, 36 (2d Cir. 2018).

[39]
    *Mathias*, 167 F. Supp. 2d at 610-11.

[40]
    *Crye Precision*, 755 F. App'x at 36 (*quoting Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 370 (2015)).

[41]
    *Mathias*, 167 F. Supp. 2d at 611.

[42]
    Pl. Br. at 15.

restrictive covenants in those agreements should be analyzed under the relatively permissive standard

applicable in the sale of a business context.  But this premise is not supported by the circumstances

of this case.

In assessing whether a contract containing a restrictive covenant is ancillary to the sale

of a business, courts have considered whether the contract was executed contemporaneously with the

sale of the business,[43] whether the purpose of the contract was to employ the owner or employees of

the business being purchased as part of the acquisition,[44] and whether the restrictive covenant referred

to the purchase agreement and/or indicates that the purpose of the non-compete is to "prevent [the

seller] from realizing the benefits of a sale of . . . good will and simultaneously retaining it to exploit

in a new business venture."[45]

Here, the Separation Agreement and 2019 Letter Agreement were entered into three

years after Mack sold his business to Haber, which strongly suggests that they are considered more

properly as distinct transactions.  Instead, the Employment Agreement – which was entered into at

the time of the 2016 sale – included restrictive covenants ancillary to the sale of Mack's business.

When Plaintiffs sought to protect further against competition when Mack's employment terminated

---

[43]
      *IVDV Assocs. Inc. v. Seruya*, No. 17-cv-1009 (SJB), 2020 WL 1501857, at *10 (E.D.N.Y. Mar. 24, 2020).

[44]
      *Payment All. Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 483 (S.D.N.Y. 2007) (holding that non-compete in employment agreement was ancillary to the sale of a business where the purpose of the sale was to obtain seller's employees and the closing documents provided that execution of the employment agreement was a necessary precondition of the sale).

[45]
      *IVDV*, 2020 WL 1501857, at *10.  *See also Weiser LLP v. Coppersmith*, 859 N.Y.S.2d 634, 635 (1st Dep't 2008) (finding restrictive covenant ancillary to a merger agreement where the partnership agreement including the covenant explicitly referenced the merger agreement and was signed simultaneously with the merger agreement).

three years later, that decision was separate and apart from the purchase of Mack's business.  In fact, plaintiffs claim that Mack was terminated because he violated his Employment Agreement.  This further demonstrates that the Separation Agreement and 2019 Letter Agreement were executed in the context of Mack's termination and not as part of Haber's 2016 acquisition of Décor's assets.[46]

In these circumstances, the mere fact that the Separation Agreement refers to intellectual property rights conveyed in the 2016 APA and affirms that Mack would not interfere with those rights does not make the new covenants added in the Separation Agreement a part of that earlier transaction.  Likewise, the fact that the 2019 Letter Agreement refers to the Employment Agreement cannot retroactively make the 2019 Letter Agreement a part of the 2016 transaction.

Finally, to the extent that plaintiffs suggest that the Separation Agreement and 2019 Letter Agreement are ancillary to Steelite's 2019 purchase of Haber's business, their argument is even less plausible.[47]  Enforceability of restrictive covenants in a contract for the sale of a business "rests on the premise that 'a buyer of a business should be permitted to restrict his seller's freedom of trade so as to prevent the latter from recapturing and utilizing, by competition, the good will of the very business which he transferred for value.'"[48]  But as Mack was a stranger to Steelite's 2019 acquisition of Haber, that rational is inapplicable.

Mack takes the opposite position and argues that the restrictive covenants in his Separation Agreement should be subject to the strict scrutiny applied to non-competes in

---

[46]

Pl. Br. at 6-7.

[47]

*Id.* at 20-21.

[48]

*DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 196 (E.D.N.Y. 1999) (*quoting Purchasing Assocs. Inc. v. Weitz*, 13 N.Y.2d 267, 271 (1963)).

employment contracts.[49]  There is some sense to this argument as the "enforcement of the restrictive covenants in the manner prayed for by [plaintiff] would result in the loss of [defendant's] livelihood for a significant period of time," which "brings the case at bar closer to the employment contract strain of cases than to the business sale strain."[50]

But the Court is not entirely persuaded by this argument either.  Mack entered into the Separation Agreement to resolve a nascent dispute regarding whether he had violated the Employment Agreement and could be terminated for cause.  Those circumstances make the Separation Agreement more similar to a settlement agreement than a typical employment contract.

Accordingly, the Separation Agreement does not fit neatly into either the "sale of business" or "employment contract" context.  But the parties' arguments create a false dichotomy.  Instead, the third standard applicable to ordinary commercial contracts is most applicable here.[51]  In any case, whether the Court considers the Separation Agreement as an employment contract or as an ordinary commercial contract makes little difference – the restrictive covenants likely fail under either standard.

The "simple rule of reason" applied to restrictive covenants in ordinary commercial contracts "still embraces consideration of the factors entailed in the employment contract test" and "differs from the employment contract test [only] by according more deference to the parties'

---

[49]

Def. Br. [Dkt. 31] at 9-10.

[50]

*Winston Franchise Corp. v. Williams*, No. 91-cv-7963 (CSH), 1992 WL 7843, at *7 (S.D.N.Y. Jan. 10, 1992).

[51]

*Id.* at 7-8. *See also Crye Precision*, 755 F. App'x at 36; *DAR & Assocs.*, 37 F. Supp. 2d at 197; *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 730 F. Supp. 1209, 1214 (E.D.N.Y. 1990).

freedom to contract."[52] Under this rule of reason, "[c]ourts will consider if the covenant: (1) protects

a legitimate business interest; (2) is reasonable in regard to geographic scope and temporal duration;

and (3) the degree of hardship imposed upon the party against whom the covenant is enforced."[53]

A restrictive covenant "may not merely insulate a party from competition."[54] Instead,

it must protect a legitimate business interest, such as avoiding unfair competition or protecting

plaintiffs' rights in its trademarks or goodwill.[55] As a corollary, a restrictive covenant cannot protect

against use of a trademark or intellectual property that the plaintiffs do not own.[56] Accordingly, the

Court must determine first which rights plaintiffs acquired from Mack in the 2016 APA.

"When an individual sells no more than the right to use his name as a trade name or

trademark he is precluded only from using his personal name as part of that of another company or

on other products . . . and not from taking advantage of his individual reputation."[57] And while "an

individual may sell the right to use his personal name . . . a court will not bar him from using that

name unless his intention to convey an exclusive right to the use of [his] own name" is "clearly

---

[52]

  *Mathias*, 167 F. Supp. 2d at 612.

[53]

  *Navajo Air, LLC v. Crye Precision, LLC*, 318 F. Supp. 3d 640, 649 (S.D.N.Y. 2018), as
  amended (Aug. 2, 2018).

[54]

  *Id.* at 650.

[55]

  *Id.*

[56]

  *Id.*

[57]

  *Madrigal Audio Lab'ys, Inc. v. Cello, Ltd.*, 799 F.2d 814, 823 (2d Cir. 1986) (internal
  quotation marks omitted).

shown."[58]  Here, it is not.  The 2016 APA conveyed "[a]ll Seller's Intellectual Property . . . as listed

in Schedule 9.16(d)" and the "Seller's goodwill" among other assets not relevant here.[59]  Schedule

9.16(d) in turn lists the relevant trade names and trademarks conveyed to plaintiffs.  The 2016 APA

does not indicate that Mack sold the right to his personal name beyond selling the Kenny Mack trade

name and trademark.[60]  Accordingly, plaintiffs have a legitimate interest only in protecting the Kenny

Mack trade name and trademark and not the use of Kenny Mack's personal name.

 In addition, while the 2016 APA did convey the "Seller's goodwill," this conveyed

at most "such goodwill as was associated with the use of the trade name" Kenny Mack and "not the

right to use [Mack's] personal name as a symbol of his individual reputation."[61]  In fact, once Mack

no longer was employed by plaintiffs, they "might commit a fraud of sorts on the public if [they]

represented [themselves] as possessing [Mack's] personal skill when that skill was not in fact

dedicated to [them]."[62]  Accordingly, while Steelite well may have a legitimate if limited business

interest in the goodwill associated with the Kenny Mack brand, it does not own Mack's personal

---

[58]

    *Id.* at 822 (internal quotation marks omitted).

[59]

    2016 APA, Schedule 1.

[60]

    *C.f. JA Apparel Corp. v. Abboud*, 568 F.3d 390, 398 (2d Cir. 2009) (noting ambiguity with
regard to whether defendant conveyed an exclusive right to his name when the contract
conveyed "[t]he names, trademarks, and trade names ... identified on Schedule 1.1(a)(A)"
and that Schedule listed foreign and domestic trademark and service mark registrations,
many of which contained defendant's name).

[61]

    *Madrigal*, 799 F.2d at 825.

[62]

    *Id.* at 825 n.5.

reputation.[63] Accordingly, plaintiffs cannot restrict Mack from using "Kenny Mack" – and whatever personal reputation it conveys – as his personal name.

But this is not the only problem with the restrictive covenants in the Separation Agreement.  The Court may enforce the restrictive covenants only to the extent they are reasonable in scope and duration.  Here, the covenants in Section 5(ii) of the Separation Agreement contain "no temporal or geographic limitation and could be read to prohibit [defendant] from [producing a competing product] in perpetuity" anywhere in the world.[64]  The covenants constrain Mack's ability to do business in any location regardless of whether Steelite ever has done business there and remain in effect forever – even if Steelite stops selling Kenny Mack products or any tableware products at all.  Such an unlimited restriction "goes far beyond that which New York courts have deemed to be reasonable."[65]

In addition, much of Section 5(ii) is unreasonably vague and overbroad.  For example, the first three clauses are not limited to the hospitality industry or businesses that compete with Steelite.[66]  In addition, Section 5(ii)(c) restricts Mack from using any of plaintiffs' manufacturers to

---

63

   *See Am. Inst. of Chem. Engineers v. Reber-Friel Co.*, 682 F.2d 382, 389 (2d Cir. 1982)
   (explaining that "where courts enforced restrictive covenants to prevent a former employee
   from unfairly profiting from the good will of the employer it was apparent that the good will
   was indeed an asset of the employer" as opposed to cases "where it appeared that the person
   against whom the restrictive covenant was sought to be enforced brought with it to the
   enterprise much of the good will for which the enterprise is seeking protection.").

64

   *Crye Precision*, 755 F. App'x at 37.

65

   *Id. See also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp.
   2d 489, 514-15 (S.D.N.Y. 2011) (restrictive covenant was unenforceable where it "d[id] not
   provide for any geographic limitations").

66

   Separation Agreement § 5(ii)(a)-(c).

produce any designs that are "substantially similar" to products in plaintiffs' catalogue regardless of whether the product is sold under the Kenny Mack brand. Likewise, the prohibition in Section 5(ii)(b) on selling any of the "product designs" in plaintiffs' catalogue does not explain whether "designs" refers to identical products or, more broadly, products with some common design attributes, the later of which likely would be overbroad.[67] Finally, the last clause in Section 5(ii) bars Mack from designing goods for display in the "food service industry." Despite plaintiffs' current insistence that this phrase is limited to hotels, restaurant, and banquets, the term is "nowhere made definite or more explicit elsewhere in the contract; nor are any of these terms clarified or limited by other contractual documents in the case."[68] Such vague and overbroad language is unreasonably burdensome and sweeps far beyond what is necessary to protect Steelite's legitimate business interests.[69]

The reasonableness of a non-compete provision is assessed also in light of the circumstances in which it was negotiated, including whether it was "negotiated by sophisticated businessman" and whether defendant "was coerced into agreeing to this covenant or . . . lacked any meaningful choice with regard to accepting it."[70] Here, it is not clear whether Mack, though not a

---

[67]     *See Crye Precision*, 755 F. App'x at 37 ("vague directive" restricting defendant from producing "patterns that are 'confusingly similar' to [plaintiff's] design" deemed unreasonable).

[68]     *Pure Power Boot Camp*, 813 F. Supp. 2d at 514-5.

[69]     *Id*. at 507 (refusing to enforce "imprecise and clearly overbroad" restrictive covenant).

[70]     *Spherenomics Glob. Contact Centers v. vCustomer Corp*, 427 F. Supp. 2d 236, 250 (E.D.N.Y. 2006) (internal quotation marks omitted). *See also DAR & Assocs.*, 37 F. Supp. 2d at 199 (explaining that "the reasonableness of these provisions is informed by the circumstances and context in which [plaintiff] seeks to enforce them" and assessing the context in which the provisions were negotiated).

20

proverbial "babe in the woods" and represented by counsel, had a meaningful choice when accepting the Separation Agreement. Mack and Haber's CEO both testified that Steelite did not intend to employ Mack following its acquisition of Haber.[71] Mack testified also that he was threatened and given an "ultimatum" either to face termination for cause – which, if justified, would have forfeited his right to payments due under the Employment Agreement and in any case likely would have resulted in costly litigation – or agree to the Separation Agreement.[72] On this record, plaintiffs have not persuaded the Court that the circumstances of the negotiation of the Separation Agreement weigh in favor of enforcing the otherwise overbroad and unreasonable restrictive covenants. Particularly given the hardship that Mack would face if these covenants were enforced, plaintiffs have not demonstrated that they are likely to persuade the Court to do so.

While the "blue pencil" rule "permits a court to partially enforce a restrictive covenant if 'the unenforceable portion is not an essential part of the agreed exchange' and the party enforcing the covenant acted in good faith," the Court will not do so where where "every aspect of the provision remains overly broad."[73] Plaintiffs have not argued that the restrictive covenant may be blue penciled or severed,[74] and the Court finds that it cannot. The entire covenant in Section 5(ii) is of unlimited duration and scope. Even if the most problematic parts of the clause were removed, the

---

[71]    Haber Dep. at 53:23-54:5; Tr. at 38:1-4.

[72]    *Id.* at 38:10-21.

[73]    *Crye Precision,* 755 F. App'x at 37-38 (*quoting BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 394 (1999)).

[74]    Plaintiffs do raise this point briefly in a footnote of their supplemental brief. But, as noted previously, the Court declines to consider these belated arguments. In any case, the Court would find the blue pencil rule inapplicable for the reasons discussed.

provision would restrict Mack's ability to compete with Steelite in perpetuity anywhere in the world. The entire covenant overreaches and the Court will not rewrite the parties' agreement in such circumstances.[75]

Accordingly, plaintiffs have not demonstrated that they are likely to succeed in enforcing the restrictive covenants in the Separation Agreement or the 2019 Letter Agreement or that there are sufficiently serious questions going to the merits of this claim to warrant a preliminary injunction.

### *Trademark Infringement Claim*

"To succeed in a Lanham Act suit for trademark infringement, a plaintiff has two obstacles to overcome: the plaintiff must prove that its mark is entitled to protection and, even more important, that the defendant's use of its own mark will likely cause confusion with plaintiff's mark."[76] Plaintiff has not demonstrated a likelihood of success on either element.

First, plaintiffs have not proven that the Kenny Mack marks are entitled to protection under Section 43 of the Lanham Act.[77] As an initial matter, plaintiffs have not alleged or claimed that these marks are registered trademarks. In "determining whether an unregistered mark is entitled to protection under § 43(a) . . . the general principles qualifying a mark for registration under § 2 of the

---

[75]

Id. at 37. *See also AM Medica Commc'ns Grp. v. Kilgallen*, 261 F. Supp. 2d 258, 263 (S.D.N.Y.), aff'd, 90 F. App'x 10 (2d Cir. 2003) (refusing to blue pencil restrictive covenant where the "[c]ontract as a whole overreaches" and could be interpreted as applying "anywhere in the world.").

[76]

*Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir. 2005).

[77]

15 U.S.C. § 1125(a).

Lanham Act are for the most part applicable."[78]  To "establish protectability . . . a mark must be sufficiently 'distinctive' to distinguish the registrant's goods from those of others."[79]  "A plaintiff can establish a mark as distinctive by showing that the mark is 'inherently distinctive,' i.e., intrinsically capable of identifying its source, or by demonstrating that the mark has acquired 'secondary meaning.'"[80]  "The scale, progressing from least to most distinctive, is described in terms of marks that are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful."[81]

Kenny Mack, "being a personal name, is a descriptive mark" and is "protectible under the Act only when it has acquired secondary meaning."[82]  "Marks acquire secondary meaning when 'the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business."[83]  "Factors that are relevant in determining secondary meaning include (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4)

---

[78]
    *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 116 (2d Cir. 2006) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

[79]
    *Id.* (*quoting Star Indus.*, 412 F.3d at 381).

[80]
    *Id.*

[81]
    *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001) (*citing Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2d Cir. 1976)).

[82]
    *Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir. 1987).  *See also Paco Sport, Ltd. v Paco Rabanne Perfumes*, 234 F.3d 1262 (2d Cir. 2000) (same) (summary order).

[83]
    *Id.*

sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use."[84]

In establishing secondary meaning, "[o]pinion testimony by a proprietor is considered self-serving

and of little probative value."[85]

       Here, plaintiffs have not put forth sufficient evidence to show that they are likely to

succeed on a claim that Kenny Mack has developed a secondary meaning and is entitled to trademark

protection.   Plaintiffs claim that the Kenny Mack mark is "not descriptive and has been in use for

almost 10 years"[86] but provide  no evidence or support for this assertion.  While Mack testified that

Ms. Urmeneta recognized the name Kenny Mack,[87] she did not indicate whether "[t]he real value in

the . . .  name lay in [Mack's] . . . individual reputation" instead of the brand associated with the

name.[88]  Such evidence therefore does not suffice to show that plaintiffs have established a likelihood

of success or even the existence of substantial questions with respect to the proposition that Kenny

Mack has acquired a secondary meaning.

       Even if plaintiffs had established that "Kenny Mack" likely has secondary meaning,

they have not demonstrated that there is a likelihood of confusion from Mack's use of his name.  In

assessing this issue, courts in the Second Circuit apply the eight-factor *Polaroid* balancing test

---

[84]    *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings*, Inc., 696 F.3d 206, 226 (2d Cir. 2012).

[85]    *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of New Jersey*, 894 F. Supp. 2d 288, 320 (S.D.N.Y. 2012), as amended (Sept. 19, 2012).

[86]    Pl. Br. at 26.

[87]    McManus Dep. at 58:21-59:5

[88]    *Madrigal*, 799 F.2d at 825.

introduced by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.1961). The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.[89] "[A] plaintiff's or plaintiff's agent's self-serving statements about . . . the likelihood of confusion created by an allegedly infringing work will usually carry limited weight in the resolution of a trademark infringement claim."[90]

Plaintiffs claim that Mack infringed on their trade name and trademark by using the name Kenny Mack in emails in calls with Resorts World.[91] As discussed previously, plaintiffs have not demonstrated that the mark is strong. Plaintiffs' evidence does indicate however, that the products sold by Mack are similar to and compete with Steelite's Kenny Mack products.[92] In addition, the name Kenny Mack contains the same words as the Kenny Mack trade name and trademark and therefore is similar to the mark in that respect.

On the other hand, Mack testified that when he introduced himself to Ms. Urmeneta, he explained that he was "Kenny Mack, formerly of Kenny Mack Designs and the Kenny Mack

---

[89]
 *Star Indus.*, 412 F.3d at 384.

[90]
 *Herbert Ltd. P'ship v. Elec. Arts Inc.*, 325 F. Supp. 2d 282, 287 (S.D.N.Y. 2004).

[91]
 Pl. Br. at 24-25.

[92]
 *See e.g.*, Dkt. 37-1 (comparison of Mack's products to products that are part of the Kenny Mack brand).

brand, which was now owned and operated by Steelite."[93] He testified also that he told Ms. Urmeneta that the Kenny Mack products were "no longer [his] products" and were "purchased and are now owned and marketed under the Steelite brand."[94] These clarifications eliminated any likelihood of confusion that otherwise might have resulted from Mack's use of his name in conversing with Resorts World.[95] Particularly given Resorts World's sophistication, Mack's explanation would likely cleared up any ambiguity regarding Steelite's and Mack's respective rights and relationship to the Kenny Mack brand.

Finally, the Separation Agreement and 2019 Letter Agreement provide Mack with the right to use the name Kenny Mack "personally and professionally" as long as the name is not used in "commerce."[96] Plaintiffs have not explained how a "professional" use differs from a use in "commerce" and whether Mack's conduct falls into the prohibited category. Accordingly, even if plaintiff established a claim for trademark infringement, it is yet unclear whether the Separation Agreement and 2019 Letter Agreement permitted the use of Mack's name in the manner complained of here.

Accordingly, plaintiffs have not demonstrated a likelihood of success or serious

---

[93]

McManus Dep. at 57:17-20.

[94]

*Id*. at 58:23-59:5.

[95]

See e.g., *Madrigal*, 799 F.2d at 823-4 (explaining that the record fails to support a likelihood of confusion where "[e]ach of the dealers who testified . . . made it clear that [defendant], in his dealings with them, explained that [defendant's company] and [plaintiff's company] were different companies and that he worked for the former.").

[96]

Separation Agreement § 5(ii).

questions with regard to their claim of trademark infringement.[97]

*Irreparable Harm*

           Not only have plaintiffs failed to demonstrate a likelihood of success on the merits, they have not demonstrated that they likely would be harmed irreparably in the absence of a preliminary injunction.[98] To demonstrate a sufficient threat of irreparable harm, a plaintiff must show an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." None of the potential harms put forth by plaintiffs meet this standard.

           ***First***, with regard to Mack's communications with Resorts World, Steelite has not demonstrated that Resorts World likely would have purchased products from Steelite if not for questionable or improper actions by Mack. Steelite's discussions with Resorts World had not progressed beyond the initial phase of ordering samples and discussing product specifications. Accordingly, Steelite's claim that it would have closed the deal if not for Mack is doubtful. In addition, aside from Mack's alleged sale of product designs in Steelite's catalogue, Steelite has not demonstrated that any of Mack's complained of conduct led Mack to obtain Resorts World's

---

[97]    Plaintiffs' brief in support of their motion for a TRO also sought relief based on Mack's alleged false advertising. Dkt. 14 at 17. Plaintiffs have not continued to pursue this argument in their preliminary injunction briefing. In any case, they have not demonstrated a likelihood of success on this claim either. Kenny Mack's statements to Ms. Urmeneta were not false. He is "Kenny Mack, formerly of Kenny Mack Designs." McManus Dep. at 57:17-20. And he made clear that he does not own the Kenny Mack brand anymore, and accordingly did not purport to sell Kenny Mack branded tableware. *Id.* at 58:23-59:5. Given this explanation, Mack's statements to Ms. Urmeneta were not likely to mislead her.

[98]    *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) (*quoting Rodriguez v. DeBuono*, 162 F.3d 56, 61 (2d Cir. 1998)).

business.[99] Finally, even if Mack's conduct did deprive Steelite of the opportunity to supply products to Resorts World, the appropriate remedy would be an award of damages in the amount of the profits lost. While Steelite claims that the loss of this business opportunity will inhibit their ability to do business with Resorts World in the future, there is no evidence to support this assertion beyond Mack's hope to do business with Resorts World in the future.[100] But Mack's aspirations are not evidence that this will occur.

      *Second*, plaintiffs contend that Mack intends to continue using the name Kenny Mack to solicit new customers and that such conduct will result in the loss of additional business opportunities for Steelite.[101] But Mack testified that he spoke only to one other customer about designing products and Steelite has not explained how this is likely to cause them any harm.[102] Even if Mack does intend to use the name Kenny Mack in pursuit of future sales, it remains entirely speculative that his doing so would result in a loss of business to Steelite.[103]

---

[99]
      For example, there is no evidence that Mack's use of a photo from Steelite's website or use of his name when communicating with Resorts World caused Resorts World to purchase the tableware from Mack.

[100]
      Pl. Br. at 30-31.

[101]
      *Id.* at 32.

[102]
      McManus Dep. at 108:14-18.

[103]
      *See e.g., Impax Media Inc. v. Ne. Advert. Corp.*, No. 17-cv-8272 (RWS), 2018 WL 358284, at *4 (S.D.N.Y. Jan. 10, 2018) (claims that defendants would "interfere with Plaintiff's relationships with an unknown number of customers and prospective customers and is currently attempting to lure other [customers] away" was insufficient to show irreparable harm where plaintiff "has not put forward evidence of potential clients with whom Plaintiff is currently contracted, in talks with, or even planning to negotiate, and the sum of whose potential business revenue is incalculable to necessitate injunctive relief.") (internal quotation marks omitted). *See also TGG Ultimate Holdings, Inc. v. Hollett*, No. 16-cv-6289

**Third**, Steelite has not demonstrated that any actionable conduct by Mack is likely to injure its reputation or good will in the industry.  While Steelite's CEO testified that his customers may think he lied when he told them that Steelite owns the Kenny Mack brand,[104] this speculation is not at all persuasive, especially in light of Mack's uncontroverted testimony, which the Court credits, that he informed Ms. Urmeneta that the Kenny Mack brand is owned and operated by Steelite.[105]  Accordingly, Steelite has not explained how Mack's use of his name will tarnish the Kenny Mack brand or Steelite's reputation.

*Balance of Hardships*

As discussed, plaintiffs have not established that they have been or are likely to be harmed significantly by any actionable conduct by Mack..  On the other hand, if a preliminary injunction were issued, Mack would be seriously constrained from practicing his trade and unable to use his name and reputation in an industry that he has worked in for a significant amount of time. More immediately, a preliminary injunction would disrupt his ability to fulfil the pending order with Resorts World.  Accordingly, the balance of hardships weighs decidedly against issuing a preliminary injunction.

---

(VM), 2016 WL 8794465, at *5 (S.D.N.Y. Aug. 29, 2016) (irreparable harm from loss of customers was not shown where plaintiff "has not identified any specific customers that have severed ties with [plaintiff].").

[104]

Tr. at 17:6-24.

[105]

McManus Dep. at 57:17-59:5.

*Public Interest*

New York's public policy, which strongly disfavors restrictive covenants, is another reason not to grant a preliminary injunction here. "New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with the general public policy favoring robust and uninhibited competition, and powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood."[106] "Since competition is generally held to benefit the public, any reduction in competition must be considered against the public interest."[107]

Particularly because plaintiffs have not demonstrated that Mack's conduct is anything but legitimate competition, the public interest will be best served by denying the preliminary injunction.

*Conclusion*

For the foregoing reasons, the plaintiffs' motion for a preliminary injunction is denied.

The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

Dated:  April 27, 2021

_____
Lewis A. Kaplan
United States District Judge

---

[106]

*Am. Inst. of Chem. Engineers*, 682 F.2d at 386 (internal quotation marks omitted).

[107]

*Dellwood Foods, Inc. v. Kraftco Corp.*, 420 F. Supp. 424, 428 (S.D.N.Y. 1976).